| | |
|---|---|
| JEFFREY MORRISON, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )　　1:18-cv-00106-DBH |
| | ) |
| PERRY SCHOOL DEPARTMENT, | ) |
| | ) |
| Defendant | ) |

## RECOMMENDED DECISION ON ADMINISTRATIVE RECORD

Plaintiff, as a parent of JM, a minor, alleges Defendant, JM's school district, violated due process and the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq. in connection with JM's education plan. (Complaint, ECF No. 1.) Plaintiff appeals from the results of a due process hearing under the IDEA and state law, in which proceeding the Hearing Officer found in favor of Defendant.

The matter is before the Court on Plaintiff's challenge to the Hearing Officer's decision on the administrative record. (ECF No. 27.) Plaintiff raises both substantive and procedural challenges.

Following a review of the administrative record and after consideration of the parties' arguments, I recommend the Court grant judgment in favor of Defendant.

## STATUTORY BACKGROUND

Under the IDEA, each state "must provide a free appropriate public education—a FAPE, for short—to all eligible children" in order to receive certain federal funds. *Endrew*

*F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017). A FAPE includes "special education and related services . . . provided in conformity with [an] individualized education program," or an IEP for short. 20 U.S.C. § 1401(9)(D). An IEP is "[a] comprehensive plan prepared by a child's 'IEP Team' (which includes teachers, school officials, and the child's parents) . . . drafted in compliance with a detailed set of procedures." *Endrew F.*, 137 S. Ct. 988, 994 (2017). An IEP must include, among other requirements, "a statement of the child's present levels of academic achievement and functional performance," 20 U.S.C. § 1414 (d)(1)(A)(i)(I)-(III), "a statement of measurable annual goals" *id.* § 1414 (d)(1)(A)(i)(II), and "a description of how the child's progress . . . will be measured and when periodic reports . . . will be provided." *Id.* § 1414 (d)(1)(A)(i)(III).

"If parents are concerned that their child is not receiving a FAPE, they can file a complaint with the local educational agency." *Pollack v. Reg'l Sch. Unit* 75, 886 F.3d 75, 79 (1st Cir. 2018) (citing 20 U.S.C. § 1415(b)(6)(A)). "They can argue that their child is being denied a FAPE substantively, on the grounds that his or her IEP lacks certain special education or related services." *Id.* at 80 (citing 20 U.S.C. 1415(f)(3)(E)(i)). "And they can argue that their child is being denied a FAPE due to procedural violations that, for example, significantly impede the parents' opportunity to participate in the IDEA decisionmaking process." *Id.* (citing 20 U.S.C. § 1415(f)(3)(E)(ii)(II) (internal quotations and modifications omitted). Filing a complaint begins a series of administrative procedures, including an "impartial due process hearing" before the state educational agency, the Maine Department of Education. 20 U.S.C. § 1415(f)(1)(A), (g); 20-A M.R.S. § 7207-B; 05-071

2

C.M.R. ch. 101, § XVI.  Following the educational agency's final decision on the complaint, an "aggrieved party" may file an action in state or federal court seeking relief from the decision.  20 U.S.C. § 1415(i)(2)(A).

## FACTUAL AND PROCEDURAL BACKGROUND

**A.     Grade Three: 2014-15 School Year**

Before March 2015, JM received special education and related services under a "Speech/Language Impairment" classification.  (R. 1009, 1011.)[1]  JM's IEP included twice weekly thirty-minute sessions with a speech pathologist and daily support services with a special education teacher.  (R. 1009.)

On March 10, 2015, the IEP team met for an annual review and discussed updates to JM's IEP.  (R. 1008 – 09.)  The team decided to modify JM's IEP, retaining the twice-weekly thirty-minute speech pathologist sessions, removing JM from monitoring status, adding one-hour daily instruction in a "resource room," and adding certain classroom and testing accommodations.  (R. 1009.)  The IEP team questioned whether the speech and language category was the correct classification for JM and determined that JM's parents would pursue an evaluation for Attention Deficit Hyperactivity Disorder (ADHD).  *Id.*

On June 24 and July 29, 2015, Jennifer Curran, Ph.D., evaluated JM at Developmental Pediatrics in Bangor.  (R. 1039 – 49.)  Dr. Curran determined that JM "is exhibiting attentional dysregulation that is consistent with a diagnosis of ADHD, Inattentive Type."  (R. 1047.)

---

[1]  (R. ___ ) refers to pages of the administrative record.

## B.     Grade Four: 2015-16 School Year

On September 23, 2015, the IEP team met to reevaluate JM's IEP.  (R. 1050.)  The team modified the IEP to replace the Speech/Language Impairment classification with an "Other Health Impairment" classification due to the ADHD.  (R. 1051, 1057.)  Plaintiff requested a one-to-one educational technician for JM, but the other members of the IEP team did not agree that the addition was warranted.  (R. 1052.) The team did not modify the special education and support services in the IEP.  (R. 1051.)

On December 3, 2015, the IEP team met to discuss concerns that Plaintiff raised by email.  (R. 1068.)  Plaintiff again inquired about an after-school tutor and a one-on-one educational technician to support JM throughout the day, but the remainder of the IEP team (the classroom teacher, special education teacher, speech language assistant, speech language pathologist, and JM's mother) determined that the services were not required. (R. 1069.)  Plaintiff also inquired about perceived discrepancies between JM's reading grade level on his report card and a testing metric.  (R. 1071.)  Plaintiff further asked to have an advocate/tutor participate in the meeting; after JM's mother objected, Plaintiff agreed to proceed rather than be forced to postpone the meeting. (R. 1149 – 53.)

The IEP team held a follow-up meeting on January 14, 2016.  (R. 1073.)  Plaintiff expressed concern about JM's performance on certain tests.  (R. 1077 – 79.)  Plaintiff and the advocate/tutor did not agree with the IEP team regarding the additional services they requested for JM.  (R. 1074, 1151 – 53.)  The IEP team agreed to consider Plaintiff's

request for extended year services when the team met again for JM's next annual meeting in March 2016.[2]  (R. 1074, 1077.)

On March 8, 2016, the IEP team met for the annual review of JM's IEP.  (R. 1098.) Plaintiff and the advocate/tutor reiterated their requests for an after-school tutor, extended year services, and in-class assistance from an educational technician rather than out-of-class sessions.  (R. 1099.)  JM's mother reported that JM did not want or need a one-on-one educational technician, and the rest of the IEP team believed that it would constitute a more restrictive environment than the current services.  (R. 1099 – 1100.)  The team retained the twice weekly thirty-minute sessions with a speech pathologist and modified the IEP to reflect JM's performance and goals, including a goal in the academic area of reading to be addressed by hour long sessions with a special education teacher five times per week.[3]  (R. 1099, 1104 – 12.)

On May 10, 2016, the IEP team met to consider additional concerns Plaintiff raised. (R. 1124.)  Plaintiff and the advocate/tutor requested individualized instruction for writing, but the rest of the team did not agree.  (*Id.*)  The classroom teacher reported that JM's writing was comparable to grade level peers.  (*Id.*)  The team updated the IEP to include additional accommodations including an agreement to mark work completed in the

---

[2] On January 21, 2016, Plaintiff filed a Dispute Resolution Request Form with the Maine Department of Education requesting mediation to address his requests for an educational technician, after-school tutoring, and extended year services.  (R. 1080 – 94.) On March 14, 2016, the parties convened a mediation, but the mediation did not resolve the issues.  (R. 1113.)

[3] The educator members of the IEP team said the intent of a FAPE is to provide services "reasonably calculated to enable the child to receive educational benefit," not to provide services superior to those students without disabilities receive.  (R. 1099.)

resource room, an agreement to mark both the original and new grade whenever JM was allowed to redo the work, and to provide JM with verbal reminders to write dates on papers. (R. 1124, 1139.)

On July 5, 2016, Plaintiff filed a complaint with the state educational agency. (R. 1148.) On August 25, 2016, after receiving documents and conducting two interviews, the complaint investigator found two violations of procedural regulations. (R. 1151 – 53.) Plaintiff had complained about the IEP team's response to the advocate/tutor he brought to the meetings beginning in December 2015. (R. 1150 – 51.) The investigator found that Defendant properly allowed the advocate/tutor to participate in the more recent meetings, but violated MUSER § VI.2B(5) and (8) by prohibiting the advocate/tutor from participating in the first meeting on December 3, 2015. (R. 1151.) The investigator also found a procedural violation when Defendant declined to modify records from IEP team meetings, which records Plaintiff disputed, because Defendant had failed to notify Plaintiff of his right to a hearing on the issue as required under 34 CFR 300.619. (R. 1152 – 53.) The state agency ordered Defendant to provide Plaintiff with written assurances that it would not repeat the violations in the future. (R. 1151 – 53.)

## C.  Grade Five: 2016–17 School Year

On February 3, 2017, Plaintiff filed another complaint with the state education agency. (R. 1228.) While the complaint was pending, on March 30, 2017, the IEP team met for another annual review. (R. 1209.) Plaintiff and the advocate/tutor again sought 100 percent placement in the classroom with the assistance of an educational technician, an after-school tutor, and extended year services; they also asked to add to the IEP a goal

and special instruction in the academic area of writing, but the rest of the team disagreed. (R. 1210.) The only changes the team made to the IEP were updates to JM's performance and goals. (R. 1210 – 25.)

On April 7, 2017, after receiving documents and conducting six interviews, the complaint investigator issued a report addressing Plaintiff's February 3 complaint. (R. 1228.) The investigator found no violations regarding JM's advancement or progress toward the established goals, Plaintiff's requests for extended year services, Plaintiff's requests for a goal and special instruction in the academic area of writing, and the alignment of the goals to state standards. (R. 1239 – 34.) The investigator found the sixty-minutes per day sessions in the resource room to be a violation of the requirement that the student be placed in the least restrictive environment because the special services amounted to "guided study hall," which could have been provided in the classroom. (R. 1240 – 41.) He also determined that Defendant measured JM's performance in subjective terms and thus was in violation of the requirement that IEP goals be objectively measurable and that quarterly reports be provided to parents; the investigator explained that "without objective data of this kind, the Student's father was unable to gauge the meaning and validity of the progress reports." (R. 1242 – 43.) The investigator directed Defendant to conduct professional training for its employees in the writing of measurable IEP goals, to reevaluate JM, and to modify the IEP if JM was still eligible for special education services. (R. 1244.)

After the IEP team met again for further discussion on May 8, 2017, (R. 1258), with the consent of JM's mother, Defendant arranged for new evaluations. (R. 1246 – 57.) Keith Hansen, Psy.D., was scheduled to conduct one part of the evaluation on May 15,

2017, but Plaintiff arrived at school and removed JM for the day. (R. 1266.) The Maine Department of Education reviewed Defendant's compliance documentation and determined that Defendant was in compliance with the corrective action plan; it closed its case on May 24, 2017. (R. 1314 – 16.)

**D.     Grade Six: 2017–18 School Year**

On June 29, 2017, Dr. Hansen evaluated JM, who was accompanied by his mother. (R. 1342.) On August 4, 2017, after considering the results of the June evaluation and reviewing a series of evaluations and reports from educators, Dr. Hansen issued a report provisionally diagnosing JM with a learning disorder in written expression and a central auditory processing disorder. (R. 1342, 1357.) JM's performance on a series of cognitive tests varied, but generally was in the low average range when compared to other children his age. (R. 1357.) JM had particular weaknesses in the area of working memory and processing speed. (R. 1346.) Dr. Hansen found that a diagnosis of ADHD was "not supported" by the current evidence because "[w]hile [JM] evidenced impairments in cognitive efficiency often associated with the diagnosis, his . . . impairments associated with ADHD were associated with auditory demands only," (R. 1358), while his attention with visual demands "was reasonably effective." (R. 1355 – 56.)

On October 5, 2017, the IEP team discussed the Hansen report. (R. 1395 – 99.) The IEP team, with the consent of JM's mother, decided to perform further evaluations as Dr. Hansen recommended, namely an audiological evaluation and an occupational therapy evaluation. (R. 1396.) The team suggested that the IEP would not change at that time, but

it intended to modify JM's IEP in the future to cease speech services and update the services and goals depending on the results of the additional evaluations. (*Id.*)

## E.    The Administrative Hearing

On July 24, 2017, Plaintiff filed a due process hearing request form with the Maine Department of Education, initiating case No. 18.008 before that agency. (R. 1 – 7, 1330 – 36.) Plaintiff claimed Defendant had failed to provide JM a FAPE under the three IEPs from 2015 to 2017, and further asserted that procedural violations had deprived Plaintiff of his right to participate in JM's education. (*Id.*) On August 9, 2017, Defendant filed a motion with the Hearing Officer seeking to dismiss the issues arising before July 24, 2015, citing the applicable two-year statute of limitations. (R. 200.) On August 30, 2017, the parties conducted a mediation and agreed that the previous special education teacher, who was now retired, would no longer be involved in JM's education. (R. 1374 – 76, 337.) The parties did not resolve the remaining issues Plaintiff raised in the hearing request form. (*Id.*) On September 29, 2017, the Hearing Officer conducted a preliminary hearing to consider Defendant's partial motion to dismiss; the Hearing Officer subsequently granted the motion. (R. 87, 111 – 18.)

On October 5, 2017, Plaintiff challenged Dr. Hansen's evaluation and requested independent expert evaluations of JM at public expense, which request required Defendant to request a due process hearing thereby initiating case No. 18.029. (R. 90 – 93, 1389 – 95.) Defendant moved to consolidate the two hearing requests. (R. 98.) On October 9, the Hearing Officer granted the consolidation request. (R. 102.)

On October 20, 2017, Plaintiff asked the Hearing Officer to recuse herself from the due process hearing, citing a number of pre-hearing decisions and communications that Plaintiff believed showed partiality toward Defendant. (R. 168 – 170.) On October 21, 2017, Plaintiff filed a motion in limine with the Hearing Officer to exclude two documents in JM's record containing information about a state court case involving Plaintiff. (R. 172 – 73.) Plaintiff argued that the evidence had "no relevance to the issues brought in the Due Process Complaint." (*Id.*)

The due process hearing was held over three days from October 23 to October 25, 2017. (R. 178.) The Hearing Officer denied Plaintiff's motion for recusal, motion for a continuance, and motion to compel the production of evidence. (*Id.*) The Hearing Officer granted Plaintiff's motion in limine. (*Id.*) On December 15, 2017, the Hearing Officer issued her ruling (R. 326 – 48), in which ruling she denied Plaintiff's substantive and procedural FAPE claims (R. 332 – 43), and denied Plaintiff's request for independent expert evaluations at public expense. (R. 343 – 47.)

On January 2, 2018, Plaintiff filed another due process hearing request, initiating case No. 18.060, which was assigned to the same hearing officer. (P. 804.)[4] Plaintiff alleged that the most recent IEP "has not been implemented", and that "[s]ervices [JM] was receiving were removed . . . ." (P. 800 – 01.) On January 8, 2018, Defendant moved to dismiss certain issues and objected to the sufficiency of the hearing request under MUSER XVI.6(B)(5) because it did not specifically describe the aspects of the IEP that Plaintiff

---

[4] (P. ___ ) refers to the additional documents Plaintiff filed in paper form with the complaint to supplement the administrative record, as reflected at ECF No. 1-1.

contends Defendant failed to implement or the services that were allegedly removed. *Id.* On January 10, 2018, the Hearing Officer dismissed claims she had addressed in the prior hearing and granted leave for Plaintiff to amend and refile his hearing request by January 15, 2018. (P. 805.)

On January 15, 2018, Plaintiff again moved for the Hearing Officer to recuse herself. (P. 807.) On January 17, 2018, the Hearing Officer denied Plaintiff's motion to recuse, and granted Plaintiff an additional five days to respond to the opportunity to amend the hearing request. (P. 818.) On January 22, 2018, Plaintiff argued that a hearing officer lacks authority to order a party to amend a hearing request. (P. 820 – 21.) On January 23, 2018, the Hearing Officer dismissed case No. 18.060 without prejudice. (P. 822.)

Plaintiff subsequently filed a complaint in federal court seeking relief from the Hearing Officer's orders. (ECF No. 1.)

## STANDARD OF REVIEW

"District courts considering challenges to administrative IDEA decisions apply an intermediate standard of review" often characterized as "involved oversight." *Johnson v. Bos. Pub. Sch.*, 906 F.3d 182, 190–91 (1st Cir. 2018); *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 989 (1st Cir. 1990).

> A district court reviews the administrative record, which may be supplemented by additional evidence from the parties, and makes an independent ruling based on the preponderance of the evidence. However, that independence is tempered by the requirement that the court give due weight to the hearing officer's findings. As a result, a district court's review "falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard.

*D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 35–36 (1st Cir. 2012) (internal quotations, modifications, and citations omitted). "When dealing with issues that implicate factual determinations made by the administrative agency, [courts] will give more deference to the hearing officer's findings. However, when confronting an issue that is more a matter of law, [courts] will give less deference as the educational expertise of the agency is not implicated." *Doe v. Cape Elizabeth Sch. Dep't,* No. 2:18-CV-00259-LEW, 2019 WL 1904670, at *9 (D. Me. Apr. 4, 2019) (internal quotations and citations omitted).

In IDEA due process hearings and lawsuits challenging whether a school district has met its procedural and substantive obligations to provide a FAPE, the burden of persuasion rests "as it typically does, on the party seeking relief." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005).

**DISCUSSION**

**A.    Substantive IDEA Claim**

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017); *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 207 (1982). This standard contemplates a "meaningful educational benefit," *Johnson* 906 F.3d at 194, and "is markedly more demanding than [a] 'merely more than de minimis' test . . . ." *Endrew F.*, 137 S. Ct. at 999. The ultimate question, however, is on "whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* at 1000.

"Actual educational progress can (and sometimes will) demonstrate that an IEP provides a FAPE." *Lessard v. Wilton Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 29 (1st Cir. 2008). But "the inverse of this rule" is not always true, because "an inquiring court ought not to condemn [an IEP] ex post merely because the disabled child's progress does not meet the parents' or the educators' expectations." *Id.*

In this case, the Hearing Officer supportably determined that the IEP was reasonably calculated to enable JM to make meaningful progress. The record includes ample evidence that JM in fact made considerable academic progress. (R. 335–40.) The persuasive evidence cited by the Hearing Officer included testimony from JM's fourth and fifth grade classroom teachers, testimony from his special education teacher, JM's performance on graded assignments, and a variety of test results conducted before, during, and after the time period of the relevant IEPs. Furthermore, Dr. Hansen's evaluation included an assessment of JM's cognitive abilities (or IQ)[5] and found that JM's performance on contemporaneous academic performance tests was consistent with other students of similar cognitive abilities at his age. (R. 1345, 1353 – 56, 1358.)

In support of his claim, Plaintiff cites JM's performance on the reading portion of periodic in-class computerized tests. Although Plaintiff points to some of the evidence that might support his contention, (*see* R. 461), most of the test results reflect that JM has made meaningful academic progress. (*See* R. 1195 – 98.) Contrary to Plaintiff's argument, a decline in testing percentile rank does not imply a lack of progress; instead, the result

---

[5] Dr. Hansen's 2017 assessment of JM's cognitive abilities was also quite consistent with Dr. Curran's 2015 results, R.899, and Dr. Sholtz's 2011 results, R. 988, bolstering the reliability of Dr. Hansen's conclusions.

simply reflects a slower progression than his peers, including peers without any impairments. *See Johnson*, 906 F.3d at 194 (explaining that courts have repeatedly emphasized the FAPE standard's focus on the individual child's circumstances).

Even if a lower test result in the area of reading evidenced a lack of progress in reading, the result would not amount to a FAPE denial because the FAPE assessment is based on the entire academic record and in this case, the record includes other substantial evidence of gains in reading and other academic areas. *See Lessard*, 518 F.3d at 30 ("The test is whether the IEP, taken in its entirety, is reasonably calculated to enable the particular child to garner educational benefits. Were the law otherwise, parents could endlessly parse IEPs into highly particularized components and circumvent the general rule that parents cannot unilaterally dictate the content of their child's IEP") (internal citations omitted). For instance, although Plaintiff resisted more recent efforts to cease special education services in the area of speech, the record includes evidence of significant progress in that area. Furthermore, none of JM's evaluations suggests a need for special education in math, and the record shows that JM made meaningful progress in math.

Even if the record established a difference between academic test results and cognitive tests results, or an absence of demonstrable improvement in academic test scores between 2015 and 2017, that evidence, without more, would not necessarily satisfy Plaintiff's burden. *See Lessard* 518 F.3d at 29. Although Defendant initially disagreed with Plaintiff's concerns about JM's difficulties in the area of writing, the record lacks any evidence to suggest Defendant declined to modify the IEP to account for the more recent

diagnosis of a writing impairment.[6] In short, a review of the record reveals that Defendant willingly reassessed JM's needs and implemented IEPs reasonably calculated to provide meaningful progress based on the information available to Defendant at the time.

One apparent deficit in JM's IEPs is the lack of objective measurable goals in certain areas, as identified by the state agency. Given the record evidence of meaningful educational benefit of the IEP, the Hearing Officer appropriately declined to award a remedy beyond the state investigator's earlier corrective action. Compensatory education is not warranted because the record lacks any evidence to support the conclusion that JM's education was impeded as the result of the deficit. The record also reflects that Defendant corrected the issue for JM and other students receiving special education services.

In sum, the record establishes that the IEPs were reasonably calculated to allow JM to make meaningful academic progress. Plaintiff is not entitled to relief simply "because [JM's] progress does not meet the parents' or the educators' expectations," *see Lessard*, 518 F.3d at 29, or because the IEP was not "ideal." *See Endrew F.*, 137 S. Ct. at 999. Defendant, therefore, is entitled to judgment in its favor on Plaintiff's substantive claims.

**B.     Procedural Claims**

Plaintiff also alleges various procedural deficiencies in the administrative process. In addition to the substantive requirements of the IDEA, an IEP is subject to procedural

---

[6] In addition, because Plaintiff did not argue at the administrative hearing that the lack of a writing goal in the IEP amounted to a FAPE denial, that issue is unexhausted and therefore cannot serve as grounds for relief in this proceeding. *See Rafferty v. Cranston Pub. Sch. Comm.*, 315 F.3d 21, 25 (1st Cir. 2002) ("IDEA requires that a plaintiff raise or exhaust claims concerning a disabled child's educational situation in the due process hearing") (internal quotation marks omitted).

requirements flowing from state or federal law. *Lessard*, 518 F.3d at 23; 20 U.S.C. § 1415(a). "In matters alleging a procedural violation," the only remedy available is an order to "a local educational agency to comply with procedural requirements," 20 U.S.C. § 1415(f)(3)(E)(iii), unless the procedural inadequacies (1) "impeded the child's right to a [FAPE]," (2) "significantly impeded the parents' opportunity to participate in the decisionmaking processes," or (3) "caused a deprivation of educational benefits." *Id.* § 1415(f)(3)(E)(ii). Accordingly, "[w]ithout finding the denial of a FAPE, a hearing officer may do nothing more than order a school district to comply with the Act's various procedural requirements." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 754 n.6 (2017). "Similarly, a court in IDEA litigation may provide a substantive remedy only when it determines that a school has denied a FAPE." *Id.* at 754 n.7; s*ee also Maine Sch. Admin. Dist. No. 35 v. Mr. R.*, 321 F.3d 9, 19 (1st Cir. 2003) ("We recognize that compensatory education is not an appropriate remedy for a purely procedural violation of the IDEA"). [7]

---

[7] Prospective relief might be moot because there is some evidence in the record suggesting that JM must attend school in another district during the 2019-20 academic year. During summer 2015, Defendant's Superintendent addressed Plaintiff's request for a superintendent's transfer agreement to permit Plaintiff's children to continue to attend Perry Elementary School despite Plaintiff's lack of residency in Perry due to a fire that damaged Plaintiff's home in Perry. (R. 1145.) In his response to Plaintiff's request, the Superintendent informed Plaintiff that the children could continue to attend school in Perry because of the extenuating circumstances and because Plaintiff expressed his intent to relocate to Perry. *Id.* The following summer, on August 10, 2016, the Superintendent asked Plaintiff for a copy of Plaintiff's driver's license and a tax bill or lease. (R. 1143.) On August 22, 2016, citing the best interests of his children, the McKinney-Vento Homeless Assistance Act, 42 U.S.C. § 11432 (g)(3)B), his two other properties in Perry, and his position on the Perry Planning Board and Equipment Committee, Plaintiff stated that he considered the matter an extension of the Superintendent's decision from the 2015-16 school year. (R. 1144.) The Superintendent later denied Plaintiff's request for a transfer agreement, but JM continued to attend school in Perry during the pendency of this lawsuit, prompting a request for a stay-put order, which the Court denied on January 16, 2019. (Recommended Decision, ECF No. 34 at 8 n.5; Order, ECF No. 36.)

Even if JM is not scheduled to attend school in Perry for the 2019-20 academic year, the Court likely maintains jurisdiction over the case because Plaintiff's requested relief can fairly be construed to include a request for compensatory education. *See E.D. ex rel. Doe v. Newburyport Pub. Sch.*, 654 F.3d 140, 143

As explained above, JM's IEPs were reasonably calculated to provide meaningful academic progress given JM's circumstances and JM in fact made meaningful progress. Any procedural irregularities, therefore, did not deprive JM of a FAPE or deprive him of educational benefit. Any procedural irregularities during the relevant time period also did not significantly impede Plaintiff's right to participate in the decisionmaking progress. The record reflects that Plaintiff was informed and consistently involved in the process, together with the advocate/tutor. In fact, Plaintiff had near perfect attendance at the relevant meetings. The record also includes hundreds of pages of email and written communications between Plaintiff and Defendant. Plaintiff's ability to participate in the decisionmaking process was not impeded by any alleged procedural shortcomings.

Moreover, Plaintiff obtained appropriate relief for any notable procedural deficiencies. The state agency addressed the lack of objective measurable targets, Defendant's initial resistance to participation of the advocate/tutor, and the lack of certain notices following disputes about the content of meeting records. The record establishes that Defendant is now in compliance with the state agency's corrective actions.

The remaining procedural issues raised by Plaintiff also do not warrant any relief from this Court. For example, Plaintiff notes that the written effective date for the IEPs was the same date as the written notice that contains a record of the IEP team meeting,

---

(1st Cir. 2011) ("While their move would obviously affect any claim the Does might make for prospective relief from any failure to provide an IEP [c]overing the period after their removal, it did not moot the claim for fees . . . ."); *D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488, 497 (3d Cir. 2012) (out-of-state move did not moot claim for compensatory education); *Indep. Sch. Dist. No. 284 v. A.C., by & through her Parent, C.C.*, 258 F.3d 769, 775 (8th Cir. 2001) (out-of-district move did not moot claim for compensatory education).

rather than the actual effective date. Any error would be harmless given that Plaintiff apparently had prior notice of the meetings and of Defendants' intent regarding the implementation of the IEPs, and the record lacks any evidence that JM's service levels changed when they should not have changed. Plaintiff also disputes whether Defendant provided all records that Plaintiff was entitled to receive, including progress reports and progress notes. The record does not support a finding that Defendant failed to provide any documents to which Plaintiff was entitled.

Plaintiff's contention that the Hearing Officer should have recused herself because she was partial to Defendant is also unavailing.[8] Because "[t]here is little precedent for how a federal district court should resolve a challenge" involving the impartiality and recusal of a hearing officer, courts have looked "to the practice of appellate courts in reviewing recusal issues involving federal district judges. . . ." *Falmouth Sch. Comm. v. B.*, 106 F. Supp. 2d 69, 73 (D. Me. 2000). The record lacks any evidence that would rebut the presumption of honesty and integrity due to the Hearing Officer. *See Mr. & Mrs. V. ex rel. H.V. v. York Sch. Dist.*, 434 F. Supp. 2d 5, 12 (D. Me. 2006). Plaintiff's arguments amount to a series of disagreements with the Hearing Officer's pre-hearing rulings, but such "rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994).

---

[8] Plaintiff raised this issue as a due process violation, but also at times argues that it constitutes a denial of IDEA procedures and state regulations guaranteeing an "impartial" due process hearing and a qualified hearing officer. *See e.g.* 20 U.S.C. 1415(f)(1)(A) − (3)(A).

In addition, contrary to Plaintiff's argument, by any objective measure, the Hearing Officer's rulings do not reveal inadequate qualifications to preside over cases as a hearing officer. Plaintiff objects, for example, to the Hearing Officer's legal knowledge and qualification, citing the Hearing Officer's reliance on *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176 (1982), which reliance Plaintiff argues revealed a lack of legal knowledge. According to Plaintiff, the Hearing Officer improperly relied on the legal standard in *Rowley* rather than the standard set forth in *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017). The decision in *Endrew F.* did not overrule or replace *Rowley*. *Endrew F.* clarified how the Supreme Court's approach in *Rowley* applied in circumstances that the *Rowley* Court declined to consider. *See Endrew F.*, 137 S. Ct. at 998 – 99. The Hearing Officer demonstrated an understanding of this relationship by discussing both decisions. See R. 332, 339. Plaintiff's challenge to the qualifications of the Hearing Officer and the Hearing Officer's impartiality thus fails.

## C. Independent Evaluation at Public Expense Claim

Plaintiff argues the Hearing Officer improperly denied his request for an independent evaluation of JM at public expense following Dr. Hansen's evaluation. Among the IDEA procedural safeguards is the right "to obtain an independent educational evaluation of the child." 20 U.S.C. § 1415(b)(1). "[I]f the parent disagrees with an evaluation obtained by the public agency" the parent can request an independent educational evaluation at public expense. 34 C.F.R. § 300.502(B)(1) – (2); MUSER V.6(B)(1). The school district may then request a hearing "to show that its evaluation is

appropriate." 34 C.F.R. § 300.502(B)(2)(i); MUSER V.6(B)(2). "The right to have a school district pay for an independent evaluation, therefore, is a backstop. It offers a parent a remedy when a school district fails to carry out its evaluative responsibilities properly." *S. Kingstown Sch. Comm. v. Joanna S.*, 773 F.3d 344, 347 (1st Cir. 2014).

Plaintiff has failed to cite any legitimate inadequacy in the evaluation conducted by Dr. Hansen. Dr. Hansen appears to be well-qualified and his methodologies were consistent with other expert evaluators. He relied on multiple tests, his observations, and information he obtained from JM's parents and teachers. Dr Hansen provided a thorough and reasoned assessment of JM's prior ADHD diagnosis, raised the likelihood of an auditory processing deficit, validated Plaintiff's concerns about JM's abilities in the area of writing, and did not minimize JM's need for special education services. The Hearing Officer properly determined that Defendant satisfied its burden to establish that Dr. Hansen's evaluation was appropriate.

**D.    Dismissal of Case No. 18.060**

Plaintiff challenges the Hearing Officer's January 23, 2018, dismissal without prejudice of his hearing request regarding Defendant's alleged failure to implement the IEP in effect while this Court considered his legal challenge to the prior IEPs. The Hearing Officer justifiably dismissed the case after Defendant challenged the sufficiency of Plaintiff's hearing request on the grounds that it lacked the requisite specificity. Plaintiff's argument that the Hearing Officer lacked the authority to order him to amend his request is without merit. The Hearing Officer did not exceed her authority by allowing Plaintiff the opportunity to amend his request and by directing Plaintiff to file an amended form to

avoid possible dismissal.  When Plaintiff failed to amend the request to include the required specificity, the Hearing Officer dismissed the matter.  Under the circumstances, the dismissal was within the authority of the Hearing Officer.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court grant judgment in favor of Defendant on the administrative record.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 11th day of July, 2019.